2018 PA Super 188

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KEVIN NEYSMITH, | : | |
| | : | |
| Appellant | : | No. 1584 MDA 2017 |

Appeal from the Judgment of Sentence, September 7, 2017,
in the Court of Common Pleas of Franklin County,
Criminal Division at No(s):  CP-28-CR-0000813-2016.

BEFORE:  OLSON, J., KUNSELMAN, J., and MUSMANNO, J.

OPINION BY KUNSELMAN, J.:                    **FILED JUNE 28, 2018**

Kevin Neysmith appeals from the judgment of sentence, after a jury convicted him of driving under the influence (DUI) of alcohol.[1]  We affirm.

Late one night, Neysmith drove upon a highway of the Commonwealth with a blood alcohol content (BAC) of 0.126.  Erratic driving ensued.  The state police, following close behind Neysmith, recorded events on their cruiser's dashboard camera.  **See** Commonwealth's Suppression Exhibit 1.  Neysmith had difficulty staying in his lane, so the troopers pulled him over.

At first, things proceeded routinely.  The police smelled alcohol; heard slurred speech; observed bloodshot and glassy eyes; and administered two field sobriety tests and four breathalyzers.  Neysmith failed both sobriety tests and did not breathe hard enough to produce readings on the breathalyzer.  As

---

[1] **See** 75 Pa.C.S.A. § 3802.

the troopers arrested him, Neysmith, drawing on his knowledge from several prior DUI arrests, asked, "Can I get a needle test, please, with all due respect?" Commonwealth's Suppression Exhibit 1; *see also* N.T. of Suppression Hearing, 12/19/16, at 14.

The state police had not requested a blood sample, so the trooper asked, "For blood?" Commonwealth's Suppression Exhibit 1.

Neysmith answered, "Yeah, for blood." *Id.*

The trooper quickly accepted, saying, "That's what we're gonna do, sir. We're gonna take you to the hospital." *Id.*

Neysmith was so sure that a BAC test would prove his innocence that, as the police patted him down, he again asked, "Do I get to take a blood test, though?" *Id.*

"Yes, we're gonna do that," the trooper reassured him. *Id.*

Later, when they were at the hospital, the police presented Neysmith with a DL-26 Form that *Birchfield v. North Dakota*, 579 U.S. ___, 136 S.Ct. 2160 (2016), would later render unconstitutional.[2] Because Neysmith had personally requested the blood draw before receiving the unconstitutional DL-

_____

[2] The DL-26 Form was not *Birchfield*-compliant, because Neysmith's arrest occurred on March 14, 2016, three months prior to the decision in *Birchfield v. North Dakota*, 579 U.S. ___, 136 S.Ct. 2160 (2016). Hence, when the events of this case transpired, the former DL-26 Form was still widely viewed as constitutional.

26 Form, the judge distinguished these events from those in **Birchfield** and permitted the jury to consider Neysmith's blood-draw results.

The jury convicted him of DUI.

Next, the trial judge scheduled Neysmith's sentencing for June 14, 2017 but, after several false starts, postponed that hearing until September 7, 2017. Neysmith caused these delays by contesting the Commonwealth's claim that he had two prior DUI convictions. He challenged the prosecutors' submission of a 2014 DUI conviction in Franklin County, Pennsylvania and a similar 2013 conviction from Washington County, Maryland. Neysmith used the alias of "Prince Fevoir St. Hilaire," in both of those prior cases. He provided that same alias to police during his arrest in this case.

In the Maryland case, an intoxicated "St. Hilaire" drove a car registered to Michelle McKeller, Neysmith's "girlfriend of seven years." Trial Court Opinion at 10. Also, the Maryland defendant's "name" and "birth date" matched the "name" and "birth date" that Neysmith used in his past DUI conviction in Pennsylvania. Thus, the trial court found that this case marked Neysmith's third DUI conviction in the past ten years. It therefore imposed a sentence of 18 to 60 months of incarceration in the state penitentiary.

This appeal followed.

Neysmith raises three claims of error. First, he challenges the admission of his blood draw into evidence, because, he claims, his consent to the draw was involuntary. Neysmith's Brief at 11. Second, Neysmith asserts that the Commonwealth's evidence was insufficient to support the trial court's finding

that he has a prior DUI conviction from Maryland. ***Id.*** Third, he argues that the trial court violated his due process and speedy-trial rights by sentencing him more than 90 days after his conviction. ***Id.*** We will address each issue in turn.

> 1. *The evidence of record supports the suppression court's finding that the DL-26 Form did not coerce Neysmith into requesting the blood draw.*

In appealing the common pleas court's admission of his BAC from the blood-draw test into evidence, Neysmith claims his consent to the test was involuntary. Specifically, he argues that "the Commonwealth presented no evidence that [his] decision to sign the ***O'Connell*** warnings[3] and allow his blood to be drawn was not due to fear of enhanced criminal penalties for refusing the blood test." Neysmith's Brief at 21-22. The suppression judge disagreed with this interpretation of the facts and found that Neysmith wanted a blood draw, because he "believed that that blood test result was going to vindicate him, demonstrate that he was not, in fact, under the influence of alcohol." N.T. of Suppression Hearing, 12/19/16, at 31-32.

Neysmith correctly states that our "standard of review is limited" when examining a suppression judge's factual findings. Neysmith Brief at 9. We review those findings "only for clear error and [are] to give due weight to

---

[3] "***O'Connell*** warnings" refer to the obligation of a police officer to inform motorists, of whom the officer requests chemical testing, that the ***Miranda*** rights are inapplicable to such tests under the Pennsylvania Implied Consent Law. ***See Commonwealth, Department of Transportation v. O'Connell***, 555 A.2d 873 (Pa. 1989). The officer must also inform motorists of the legal consequences they will face if they refuse consent to the blood-draw.

inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas v. United States*, 517 U.S. 690 (1996). When applying a "clearly erroneous" standard, the suppression court's findings of fact are binding upon the appellate court, unless definitely and firmly convinced that the lower court made a mistake. In other words, we shall only reverse a finding of fact if it is implausible in light of the reviewable evidence.

Our scope of review in these matters is limited to certain suppression-hearing evidence. *See In re L.J.*, 79 A.3d 1073 (Pa. 2013). Because the Commonwealth prevailed on this issue in the suppression court, we consider "only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. When the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error." *Commonwealth v. Johnson*, 33 A.3d 122, 124 (Pa. Super. 2011).

In this case, the crux of the issue is whether Neysmith's consent to the blood draw was knowing and voluntary. *See* Neysmith's Brief at 18; Commonwealth's Brief at 2. Valid consent is "the product of an essentially free and unconstrained choice—not the result of duress or coercion, express or implied, or a will overborne—under the totality of the circumstances." *Commonwealth v. Caban*, 60 A.3d 120, 130 (Pa. Super. 2012), *overruled*

*on other grounds as recognized in Commonwealth v. Coleman*, 130 A.3d 38, 42 n.1 (Pa. Super. 2015).

Neysmith contends that the Commonwealth coerced him into requesting the blood draw, because he knew, based on a DUI arrest in Luzerne County in 2003, that refusing an officer's blood-draw request would result in enhanced criminal penalties. Neysmith's Brief at 21. He also claims that the pre-*Birchfield* DL-26 Form, which the troopers presented to him at the hospital, confirmed his understanding that enhanced penalties would apply to a refused blood draw.[4]

Nowhere in his brief does he say how or why the judge's findings of fact were clearly erroneous, implausible in light of all the evidence, or unsupportable given the facts of record. Instead, Neysmith is asking us to revisit the suppression judge's view of the facts.

This we may not do, given our narrow scope of review and deferential standard of review applicable to suppression judges' findings of fact. Here, the suppression judge watched the Commonwealth's video of Neysmith repeatedly requesting a blood draw. She found that, after he failed two field sobriety tests and four breathalyzer attempts, Neysmith was worried about

---

[4] By contrast, in *Commonwealth v. Robertson*, ___ A.3d ___, 2018 WL 2057000 (Pa. Super. 2018), the Pennsylvania Department of Transportation had revised the DL-26 Form in light of *Birchfield*. The *Roberston* Court held that a defendant's prior knowledge of enhanced criminal penalties from the pre-*Birchfield* form is irrelevant to determining consent, because we presume that everyone knows current case law. Of course, *Roberston* is inapplicable to the case at bar, because Neysmith received the pre-*Birchfield* DL-26 Form. Nonetheless, his consent was voluntary, as explained herein.

one thing and one thing only – going to jail for yet another DUI. So, she concluded that Neysmith begged the state police to let him take a blood-draw test as a final hope of proving his innocence. Indeed, he never expressed any concerns over enhanced penalties for refusing a blood draw – a blood draw that was his own idea. Because the police never requested permission to take the blood test, they could not have overborne Neysmith's will to say "no." Neysmith said "yes" to this search without the troopers ever asking him for his consent.

Moreover, nothing of record indicates that Neysmith requested a blood draw, because he feared enhanced penalties for refusing the test. Thus, the suppression judge's finding of fact – namely, that the DL-26 Form played no part in Neysmith's consent – was anything but "implausible." It was a rational conclusion to draw and, therefore, not clearly erroneous. As such, that factual finding is binding upon this appellate court. *See Ornelas*, *supra*; *Johnson*, *supra*.

In a footnote, Neysmith attempts to draw a nonexistent distinction between his case and *Commonwealth v. Haines*, 168 A.3d 231 (Pa. Super. 2017), because the trial judge relied upon *Haines* in her 1925(a) opinion. Neysmith claims that *Haines* "is not dispositive because the Superior Court there merely remanded the case to the suppression court for that court to consider the issue of timing of the consent for a blood draw." Neysmith's Brief at 21 n. 3. This argument fails, because it substitutes *Haines*' procedural

result with its precedential holding. That does not distinguish **Haines** from the case at bar.

The **Haines** record did not clearly indicate *when* the defendant had consented to the blood draw: before or after receiving the **Birchfield**-offending DL-26 Form. Thus, the panel remanded for the trial court to ascertain the precise moment of consent. The question on remand was which came first: constitutional consent or unconstitutional coercion. To guide the suppression court, we articulated the following bright-line, conditional rules:

> **if** [a DUI suspect] validly consented **before** being informed that he faced enhanced criminal penalties for failure to do so, then his consent would not be tainted by the warning and the blood test results would be admissible. **See Birchfield**, 136 S.Ct. at 2185–86. If, however, he did not consent until after [police] informed him that he would face enhanced criminal penalties if he refused to consent, then the trial court did not necessarily err in granting his motion to suppress the test results. **Id.**

**Haines** 168 A.2d at 236 (emphasis in original).

Here, the suppression court has determined when the consent occurred – Neysmith "consented **before** being informed that he faced enhanced criminal penalties for failure to do so." **Id.** Thus, "his consent" is un-"tainted by the warning and the blood test results would be admissible." **Id.** We therefore conclude that **Haines** controls the outcome of this case, and the suppression judge properly applied it to the facts as she found them.

The judge concluded – and we agree – that the constitutional infirmities of the previous DL-26 Form played no part in Neysmith's consent to (and

desire for) a blood draw. His desire and consent arose at the time of arrest, well before he received and read the unconstitutional DL-26 Form.

Thus, Neysmith's first appellate issue is without merit.

   *2. Sufficient evidence supports the trial court's finding that Neysmith pleaded guilty to a DUI in the State of Maryland.*

In his second claim of error, Neysmith says that there was insufficient proof – by a preponderance of the evidence – that, in 2013, he pleaded guilty to a DUI-equivalent charge in Maryland.

Our standard of review is *de novo*, and our scope of review is plenary, because:

> a claim challenging the sufficiency of the evidence is a question of law . . . When reviewing a sufficiency claim the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

***Commonwealth v. Widmer***, 744 A.2d 745, 751 (Pa. 2000) (internal citations omitted).

The Pennsylvania General Assembly has established the burden of proof at evidentiary hearings regarding prior convictions.

> If the offender or the attorney for the Commonwealth contests the accuracy of the record, the court shall schedule a hearing and direct the offender and the attorney for the Commonwealth to submit evidence regarding the previous convictions of the offender. The court shall then determine, by a **preponderance of the evidence**, the previous convictions of the offender and, if this section is applicable, shall impose sentence in accordance with this section.

42 Pa.C.S.A. § 9714 (emphasis added).

- 9 -

Neysmith argues that the Commonwealth failed to prove "that there is not another individual whose name is actually Prince St. Hilaire whose identity [Neysmith] was using." Neysmith's Brief at 25. Neysmith believes that the Commonwealth needed to produce "photographic, fingerprint, or other reliable identifying evidence which could **assure** the Court that" he was the person convicted in Maryland. **Id.** at 24 (emphasis added). By using the word "assure," Neysmith demonstrates a fundamental misunderstanding for the burden of proof. His demand for evidentiary assurance calls for a degree of certainty not required in proving a prior conviction. **See United States v. Davis**, 710 U.S. 104, 107 (3d Cir. 1983) (joining five other circuits to hold that a statutorily-required, preponderance-of-the-evidence burden of proof at sentencing hearings comports with Due Process Clause).

A "preponderance of the evidence" is only "the greater weight of the evidence, *i.e.*, to tip a scale slightly is the criteria or requirement for preponderance of the evidence." **Ferri v. Ferri**, 854 A.2d 600, 603 (Pa. Super. 2004) (**citing Commonwealth v. Brown**, 786 A.2d 961, 968 (Pa. 2001), **cert. denied**, 537 U.S. 1187 (2003)). In other words, when weighing the evidence of record, the trial judge need only find that the fact in question is more-likely-than-not true. Thus, at prior-conviction evidentiary hearings, the Commonwealth need not "assure" the court of anything. It need only show that prior convictions probably belong to the offender. To determine whether the Commonwealth offered evidence sufficient to tip the evidentiary

scale in its favor, we will review all of the evidence and testimony offered at the sentencing hearing.

On the side of the scales favoring the Commonwealth's proposition that Neysmith and "St. Hilaire" are the same individual, first and foremost is the certified record from Washington County, Maryland. *See St. Hilaire*, *supra*. "The proof of prior conviction is a simple historical fact which may be ascertained through official documents." *Commonwealth v. Lark*, 504 A.2d 1291, 1298 (Pa. Super. 1986). The Commonwealth provided these official documents from Maryland and made them of record as its Sentencing Exhibit 1. Those documents identify Neysmith by his alias, "Prince Fevoir St. Hilaire," the same name he provided to the troopers upon his arrest in this case. He likewise used that same alias in 2014, for another DUI arrest and conviction in Franklin County, Pennsylvania, a conviction Neysmith's counsel admitted the Commonwealth "established." N.T. of Sentencing Hearing, 9/7/17 at 23.

The official documents from Maryland also show a birth date matching the one Neysmith provided for his prior, Franklin County DUI case. Moreover, Neysmith's Pennsylvania record included photographs of him, with the words "Name Used: Prince Fevoir St. Hilaire" below his face. Commonwealth's Sentencing Exhibit 3. The person in that picture matches the image of the man arrested in the video from this case. *See* Commonwealth's Suppression Exhibit 1.

Also supporting the conclusion that Neysmith was the Maryland offender is the fact that the Commonwealth discovered that conviction by searching

trustworthy databases – the Unified Judicial System's website, the Justice Network of the Pennsylvania State Police, and the Maryland Judiciary's website. The district attorney's staff entered various data on Neysmith into these systems, including his name, alias, and birth date(s). They matched. Those online sources returned the case of **State v. St. Hilaire** from the District Court of Washington County, Maryland,[5] because the false data that Neysmith provided here corresponded with the false data he provided there.

Finally, we give great weight to the fact that the various vehicles that Neysmith drove while intoxicated in 2013, 2014, and 2016 all belonged to his girlfriend, Michelle McKeller. In fact, Neysmith used the *exact same* vehicle to commit DUI in Maryland that he used in 2014 in Pennsylvania.

On the other side of the scales, to counterbalance the Commonwealth's weighty evidence, there is . . . nothing.[6]

Thus, we find, as a matter of law, all of the evidence of record supports the Commonwealth's proposition that Neysmith, under his alias Prince Fevoir

---

[5] Maryland District Court's docket No. 00YC0B3J.

[6] This Court draws no inference from Neysmith not presenting any evidence at sentencing. Remaining silent was his right under the Fifth Amendment to the Constitution of the United States. **See Mitchell v. United States**, 526 U.S. 314, 317 (1999) (holding that the right to remain silent applies during sentencing and a "court may not draw an adverse inference from the defendant's silence"). Nevertheless, Neysmith's humbuggery is not proof, and nihilism does not preclude a court from weighing hard evidence against the nothingness proffered to rebut it. Thus, the right to remain silent is rather less effective at sentencing than at trial, because the Commonwealth's burden of proof is far easier to carry at this point in the proceedings. One credible utterance outweighs silence.

St. Hilaire, pleaded guilty to DUI in Maryland in 2013. As such, the evidentiary scales can only tip in the Commonwealth's favor. We conclude, *de novo*, that the Commonwealth offered sufficient evidence proving Neysmith's conviction in Maryland by a preponderance of the evidence. Therefore, we concur with the trial court on Neysmith's second appellate issue.

> 3. *The trial judge did not abuse her discretion by sentencing Neysmith 108 days after his conviction.*

Lastly, Neysmith argues that the trial court violated his rights to due process and a speedy trial, because it sentenced him 18 days after the 90-day time period that Pennsylvania Rule of Criminal Procedure 704 indicates. "[S]entence in a court case shall ordinarily be imposed within 90 days of conviction . . . ." Pa.R.Crim.P. 704. The parties agree that sentencing occurred outside the ordinary time frame of 90 days, but they disagree as to whether Neysmith is entitled to relief (*i.e.*, discharge of his sentence) due to an 18-day delay.

Before addressing Neysmith's claim, we must determine our scope and standard of review to a challenge under Pa.R.Crim.P. 704. Our precedents have omitted this step from their Rule 704 analyses, when sentencings have occurred outside the Rule's 90-day window. ***See, e.g., Commonwealth v. Null***, ____ A.3d ____ (Pa. Super. 2018) (failing to discussion scope and standard of review); ***Commonwealth v. Diaz***, 51 A.3d 884, 891 (Pa. Super. 2012) (accord, but weaving in an abuse-of-discretion standard of review as to the fashioning of the defendant's sentence); ***Commonwealth v. Dozier***, 99 A.3d

106 (Pa. Super. 2014) (accord); **Commonwealth v. Fox**, 953 A.2d 808 (Pa. Super. 2008) (accord); **Commonwealth v. McLean**, 869 A.2d 537 (Pa. Super. 2005) (accord); **and Commonwealth v. Still**, 783 A.2d 829 (Pa. Super. 2001) (accord, reviewing a trial court's application of former Pennsylvania Rule of Criminal Procedure 1405(A), the immediate predecessor of Pa.R.Crim.P. 704, without articulating this Court's scope or standard of review).

To articulate an appropriate scope and standard of review, we must first look to the substantive test we are reviewing to ascertain our proper appellate role in applying it. In **Commonwealth v. Anders**, 725 A.2d 170 (Pa. 1999), the Supreme Court of Pennsylvania mandated that "the **trial court** should consider" four factors to determine whether a delay outside the ordinary 90 days established in the Rules of Criminal Procedure warrants discharge of the case. **Id.** at 173 (emphasis added). Those factors are:

> (1) the length of the delay falling outside of Rule 1405(A)'s 60-day-and-good-cause provisions, (2) the reason for the improper delay, (3) the defendant's timely or untimely assertion of his rights, and (4) any resulting prejudice to the interests protected by his speedy trial and due process rights. [Citing **Glover**, **supra**]. Prejudice should not be presumed by the mere fact of an untimely sentence. "Our approach has always been to determine whether there has in fact been prejudice, rather than to presume that prejudice exists." [Quoting **Glass**, 526 Pa. at 337, 586 A.2d at 372-73]. The court should examine the totality of the circumstances, as no one factor is necessary, dispositive, or

> of sufficient importance to prove a violation. [Citing **Greer**, 382 Pa.Super. at 138 n. 4, 554 A.2d at 985 n. 4]."[7]

**Id.** (brackets in original).

Had the Justices intended the Superior Court to apply the factors as a matter of law, they would have remanded **Anders** here. Instead, the Justices remanded to the trial court "for an evidentiary hearing and argument concerning [Anders]' right to relief for untimely sentencing." **Id.** at 173–74. Because evidentiary hearings are necessary under Pa.R.Crim.P. 704, it follows that whether to discharge a defendant under the **Anders** factors cannot be a pure question law for *de novo* review by this Court. Otherwise, the evidentiary hearing ordered in **Anders** would have been pointless. Hence, we conclude that whether discharge is required when sentencing occurs after the 90 days under Rule 704 presents a mixed question of fact and law.

"Mixed questions of fact and law raise a unique issue as to the appropriate standard of review," because, as Chief Justice Saylor has noted, we have no "'universal' standard of review that would be applicable to these types of determinations." Bauman, "Standards of Review and Scopes of Review in Pennsylvania-Primer and Proposal," 39 Duq. L. Rev. 513, 546-547 (2001) (**citing Warehime v. Warehime**, 761 A.2d 1138 (Pa. 2000) (Saylor, J. concurring)). As the Chief Justice said:

---

[7] This block quote in **Commonwealth v. Anders**, 725 A.2d 170, (Pa. 1999), refers to Pennsylvania Rule of Criminal Procedure 1405, now Pennsylvania Rule of Criminal Procedure 704. Pa.R.Crim.P. 1405 had a 60-day window for sentencing, which Rule 704 now extends to 90 days.

> This, perhaps, results from the fact that mixed questions differ in terms of the degree to which the legal versus the factual aspects predominate. ***See generally Commonwealth v. Santiago***, 439 Pa. Super. 447, 466, 654 A.2d 1062, 1072 (1994) (describing federal courts' approach to review of mixed questions, which varies according to the predominance of legal over factual aspects).

***Warehime*** at 1146 n. 4. (Saylor, J. concurring). He suggests that we employ a deferential standard of review when the questions under review "are mixed ones of law and fact, with the factual aspects predominating." ***Id.*** at 1147.

A Pa.R.Crim.P. 704 motion seeks to redress individualized harm arising from untimely proceedings. Rather than mechanically applying a fixed, 90-day period for sentencings, ***Anders*** instructs common pleas courts to evaluate amorphous concepts such as "length of delay," "good cause," and "prejudice." These inquiries are case-specific and fact-intensive. Thus, we conclude that factual aspects predominate this mixed question of law and fact, and the trial judges sit in the best position to determine the causes and impacts of delays in their own courtrooms. Accordingly, we adopt the Chief Justice's reasoning in ***Warehime***, and we will review the trial court's application of the ***Anders*** factors deferentially.

Hence, we defer to the trial court's judgment on this issue of alleged undue delay and shall reverse only for an abuse of discretion. We have long held that mere errors in judgment do not amount to abuse of discretion; instead, we look for "manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." ***Grady v.***

*Frito-Lay, Inc.*, 839 A.2d 1038, 1046 (Pa. 2003) (*citing Paden v. Baker Concrete Constr., Inc.,* 658 A.2d 341, 343 (Pa. 1995)). In addition, a trial court abuses its discretion if "the law is overridden or misapplied." *Paden* (*quoting Mielcuszny et ux. v. Rosol*, 176 A. 236, 237 (Pa. 1934).

Lastly, given the importance that the *Anders* Court placed upon having an evidentiary hearing and the trial court applying the four factors to the facts it finds, we hold that our scope of review is limited to the evidence on the record of the Rule 704 evidentiary hearing and the factual findings of the trial court. Also, we must view the facts found in the light most favorable to the prevailing party.

Having ascertained our standard and scope of review, we now turn to Neysmith's argument on this issue. In his brief, Neysmith focuses almost entirely upon the fourth factor in *Anders*, claiming that the 18-day delay prejudiced him, because, "due to his transportation between the Franklin County Jail and State Correctional Institutions," he "was unable to complete the programming necessary for him to be paroled in a separate criminal case . . . ." Neysmith's Brief at 30. He adds that "there was no good cause shown as to why [Neysmith's] sentencing was continued past 90 days." *Id.* Neysmith does not expound further upon his second contention.

The trial judge disagreed with both claims. She found as a fact that Neysmith "was not prejudiced in the delay in sentencing." Trial Court Opinion at 11. Indeed, Neysmith placed no evidence into the record to demonstrate

- 17 -

his alleged prejudice. His unsubstantiated assertions of harm cannot undercut the trial judge's findings.

Moreover, the trial court observed that Neysmith caused the delay by requiring the Commonwealth to prove his prior DUI convictions, as described above. In overruling Neysmith's Pa.R.Crim.P. 704 objection, the trial judge explained from the bench, "Mr. Neysmith has, in the Court's mind, been the cause of this issue. This is Mr. Neysmith's failure to accept responsibility." N.T. of Sentencing Hearing, 9/7/17, at 26.

In essence, by making the Commonwealth procure the official records from the District Court of Washington County, Maryland, the trial court found that Neysmith – instead of making a *bona fide* defense – was just obstructing the process. Hence, the trial court concluded that any "prejudice" that may have befallen Neysmith was of his own making. Had he not demanded that the Commonwealth jump through post-trial hoops to prove a conviction that Neysmith did not testify against or call one witness to rebut, he would have been in the penitentiary to complete his programming and potentially been paroled. Of course, in light of his subsequent conviction in this matter, Neysmith's could only hope for parole in lieu of incarceration. Thus, his claim of prejudicial harm was, at best, speculative.

In the trial court's judgment, Neysmith's delayed sentencing was self-inflicted. Such judgment does not "manifest unreasonableness." **Grady**, **supra**. Also, Neysmith's brief does not allege bias, partiality, prejudice, or ill

will anywhere. And, he does not claim that the trial court misapprehended the **Anders** factors or improperly weighed them.

Instead, Neysmith simply reargues his case to us. But, as the Supreme Court of Pennsylvania demonstrated in remanding **Anders** to the trial court, this Court is not primarily responsible for applying the four factors. And our review of their application is not *de novo*. Our appellate sphere is restrained. We may not simply displace the trial court's judgment with our own on such a fact-sensitive, situationally driven matter.

On this record, the most we can say of the trial judge's judgment is that reasonable people might fairly disagree with it. But, reaching a disputable conclusion does not make for an abuse of discretion.

Thus, Neysmith's final assignment of error is meritless, as well.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/28/2018