J-S70029-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| QUIR RANDALL | : | |
| | : | |
| Appellant | : | No. 3154 EDA 2017 |

Appeal from the Judgment of Sentence Entered September 25, 2014
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0003557-2012

BEFORE: GANTMAN, P.J., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY McLAUGHLIN, J.: **FILED MARCH 21, 2019**

Quir Randall appeals from his judgment of sentence entered in the Philadelphia County Court of Common Pleas on September 25, 2014. Randall challenges the sufficiency of the evidence and the trial court's decision to deny him a new trial based upon alleged after discovered evidence. Prior to this appeal, we remanded for the trial court to entertain Randall's claim that he should have a new trial at which he could present the testimony of a proposed alibi witness, Marc Henderson. The trial court heard testimony, found as a fact that Henderson's testimony was not credible, and rejected the claim. We affirm.

A jury found Randall guilty, in April 2014, of attempted murder and possession of an instrument of crime. The charges arose in connection with a

shooting, and Randall was tried jointly with his brother.[1] The trial court aptly

summarized the facts underlying Randall's conviction:

> [Randall], and his co-defendant brother, Mustifa "Mo-Mo" Randall, were convicted for the November 29, 2011, attempted murder of Complainant, Salvatore "Little Sal" Brunetti, Jr.
>
> Jahlil Blount testified he knew [Randall] as "RA" and the co-defendant as "Mo-Mo." He frequently saw them hanging out at the intersection of Oakmont Street and Torresdale Avenue, and he knew them because he used to buy marijuana from them.
>
> Jahlil testified that at approximately 1:00 p.m. on November 29, 2011, he and the Complainant's brother, Michael Brunetti, were walking through an alley between Marple Street and Oakmont Street when they encountered the co-defendant and a group of guys standing outside of 4715 Oakmont Street. A male described by Jahlil as a "white boy" in the group pointed at Michael and said: "That's the guy's son right there." The "white boy" began to follow them and threw a bottle at Michael. Michael told Jahlil to call his father, Salvatore "Big Sal" Brunetti, Sr.
>
> Jahlil and Michael continued to walk. When they approached the corner of Marple Street and Torresdale Avenue, they observed [Randall] walking towards the alley. As Michael was on the phone with Big Sal, [Randall] walked across the street towards them and said: "Who are you all calling around here?"
>
> Jahlil and Michael met up with the Complainant and Big Sal, whereupon the four men decided that they would walk back to fistfight [Randall], co-defendant, and their friends. Jahlil walked on one side of the street, and the Complainant, Michael, and Big Sal walked on the other side. As they approached the intersection at Oakmont Street and Torresdale Avenue, [Randall] and co-defendant were standing outside. [Randall] was standing on the side of Oakmont Street near Torresdale Pizza in a red shirt. The co-defendant was standing on the opposite side of Oakmont Street near the dentist's office in a black hoodie. The "white boy" was approximately eight steps behind the co-defendant.

---

[1] ***See Commonwealth v. Randall***, 3059 EDA 2017, J-S70028-18, which we are deciding today in a separate memorandum.

Michael threw off his shirt as he approached the intersection to show that he was ready to fight and that he did not have any weapons. The co-defendant walked towards them with his knees slightly bent and a silver revolver in his right hand, pointed his firearm at the Complainant and Michael, and started shooting. [Randall] had a black firearm, but Jahlil did not see him fire it. However, Jahlil testified that he heard two different guns shoot approximately seven shots in total: three shots from a gun that sounded like a "firecracker," and four from a gun that sounded "like a big pow, pow."

Jahlil ran into an auto body shop on Torresdale Avenue as soon as he saw the co-defendant shooting. When he came back outside, he saw [Randall] and co-defendant running towards 4715 Oakmont Street, the house where Michael and he had first encountered [Randall] and his friends. He then saw the Complainant lying on the ground between two cars.

Michael Brunetti, the Complainant's brother, testified that Jahlil Blount and he were walking through an alleyway to get pizza near Torresdale Avenue and Oakmont Street in the afternoon just prior to the shooting when they encountered a group of six or seven guys. Michael heard one of the guys say: "Yo; that's the guy's son right there." As Michael and Jahlil continued to walk, the group of guys ran up the alleyway behind them and threw bottles at Michael. Michael and Jahlil ran towards Michael's house until the group stopped chasing them. He then called his father Salvatore "Big Sal" Brunetti, Sr. and told him what happened.

Michael, Jahlil, Big Sal, and the Complainant walked to the intersection of Torresdale Avenue and Oakmont Street to confront the group of guys. Michael took off his shirt and walked up with his hands in the air to show them that he didn't have any weapons. [Randall] and co-defendant ran towards Michael, Jahlil, Big Sal, and the Complainant and immediately opened fire. Michael testified:

> "They come running up, and one guy started shooting, and I hear more gunshots over my shoulder. I look over my shoulder for a second, and there was another guy standing right there, in front of the pizza store . . . and the other guy was basically in front of the dentist's shop . . . when he started to shoot."

Michael turned around and screamed: "They got guns; run, run, run." He then saw his brother lying on the ground. Michael

identified [Randall] as the person who was in front of Torresdale Pizza and testified that he was the one who shot the Complainant. He identified the co-defendant as the person who first ran towards him and started shooting. The co-defendant had his hair braided and was standing near the dentist's office holding a silver gun.

In a statement on November 30, 2011, Michael identified [Randall] in a photo array and told detectives: "He had the gun and shot my brother. He was on the same side of the street from [sic] my brother [near the pizza store.]" Michael testified that he did not tell detectives that he knew [Randall] when he gave his statement on November 29, 2011, because he was afraid that he would get in trouble for going to fistfight [Randall] and co-defendant.

The Complainant's sister, Jessica Serrano, testified that she knows the co-defendant by face and name because she had purchased marijuana from him. Jessica also knew [Randall] as "RA." She and her sister, Christina Brunetti, followed their father and brother out of the house and stood near the corner of an alley near Oakmont Street and Torresdale Avenue and watched the shooting. She testified as follows:

> "As I run, I see Mo-Mo shooting first - Mustifa. I see him shooting first, and I guess he missed my brother. Then the other brother-I know him as "RA" [Appellant Randall] - he runs over, and - he is actually running toward my brother, and he started shooting, and he ends up hitting him, and all I see is my brother drop to the floor."

[Randall] was standing on the side of Oakmont Street near the pizza store. The co-defendant was standing on the opposite side of the street near the dentist's office.

In a statement to detectives on November 29, 2011, Jessica described the shooter as a black male, approximately 5'9", 140 lbs, wearing a navy blue hoodie and dark blue jeans. She told detectives that the shooter hangs out with "Mo-Mo," the co-defendant. In a statement on November 30, 2011, she identified [Randall] in a photo array and wrote above his picture, "He's the guy that ran up from behind and shot my brother."

Complainant, Salvatore "Little Sal" Brunetti, Jr., testified that Big Sal, Michael, Jahlil, and he walked towards the intersection at Oakmont Street and Torresdale Avenue to confront

a group of guys that had thrown beer bottles at Michael. The Complainant testified:

> "When we met up with my brother and Lil (Jahlil Blount), we started walking to meet them. I didn't even know who we were meeting up with. Then I heard gunshots, and I started running, and I felt I got hit in the back of my head. I felt my head. I felt blood. I looked around and I saw this [b]lack guy, with a hoodie on, with his gun out, and that was it. That's all I remember."

The Complainant testified that he was shot in the back of his head, and that he was unconscious in the hospital for months. He suffered brain damage and partial paralysis as a result of the shooting.

Counsel stipulated that a large caliber projectile was removed from the Complainant's wound in the back of his head.

Diana Sheard testified that she was living at 4715 Oakmont Street on November 29, 2011, and that she had known [Randall] and co-defendant for approximately one year. She dated [Randall] months prior to the shooting.

Sheard saw the first altercation between [Randall's] group and Michael Brunetti, and testified that [Randall] and co-defendant were involved in both that altercation and the shooting. Sheard was standing on her porch that faces Torresdale Pizza with a friend when [Randall] came around the corner and said, "You all need to go in the house." She then observed Michael Brunetti take off his shirt to "rumble," but "the rumbling turned into a firing match, one way."

Sheard testified that she had an unobstructed view of the shooting from her house, and that she saw [Randall] standing in front of the pizza shop holding a gun. Sheard testified that [Randall] was wearing a red hoodie on the day of the incident. In a statement to detectives, Sheard stated that [Randall] had on a red hoodie prior to the shooting and a black hoodie on at the time of the shooting. However, Sheard unequivocally testified that [Randall] was one of the shooters.

Tr. Ct. Op., 3/15/16, 2-7 (citation omitted).

After the jury found him guilty of the above referenced charges, the trial court sentenced Randall to an aggregate term of 10 to 20 years in prison followed by five years of probation. Randall filed a timely direct appeal but his trial counsel failed to file a Pa.R.A.P. 1925(b) statement or an appellate brief. Ultimately, the trial court appointed new counsel, Attorney Levin, subsequent to a **Grazier** hearing.[2] This Court granted Attorney Levin's petition to remand for the filling of a Pa.R.A.P. 1925(b) statement. Attorney Levin filed Randall's Pa.R.A.P. 1925(b) statement on February 12, 2016, asserting, *inter alia*, that the evidence was insufficient to sustain his convictions. The trial court issued a comprehensive opinion regarding the same on March 15, 2016.

Randall subsequently moved for a remand to consider his claim of after-discovered evidence, based on alleged alibi witness Henderson's testimony. Although we initially denied the motion, we later granted it on reconsideration, directed the trial court to hold an evidentiary hearing on the claim, and relinquished jurisdiction. **See Commonwealth v. Randall**, No. 2961 EDA 2014 (Pa.Super. filed Dec. 13, 2016)(unpublished memorandum).

At the hearing, which also served as a Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546, hearing for Randall's brother, Henderson testified that at the time of the shooting he was with Randall and his brother, approximately two blocks away from the scene. Henderson explained that he had been incarcerated in a community corrections facility

---

[2] **Commonwealth v. Grazier**, 713 A.2d 81 (Pa. 1998).

halfway house, but had escaped 11 days before the day of the shooting. He claimed he met the Randall brothers to get either money or drugs to support himself while he was on the run, and during the meeting, Randall gave him 125 grams of crack cocaine and $250 in cash.

According to Henderson, during the meeting, he heard several gunshots, and shortly thereafter, walked to a bus stop with Randall's brother where they both boarded a bus. He testified that at the time of the shooting he had known both brothers for years, having known them since childhood and having been in juvenile placement with Randall. He also said that while a fugitive, he actively evaded law enforcement, did not communicate with either Randall brother, and neither brother knew his whereabouts. He further stated that he would not have testified at Randall's trial because doing so would have resulted in his arrest.

Henderson remained a fugitive until 2015 when he was apprehended. Randall testified that he got back in touch with Henderson in January 2016 when both he and Henderson were incarcerated in SCI-Somerset. He said at the time of the shooting he did not know Henderson's last name or how to contact him.

Following the hearing, the trial court denied relief. The judge reviewed the evidence in detail on the record and stated that she found Henderson "to be quite incredible." N.T., 9/7/17, at 121. She pointed out that Henderson claimed he waited 11 days after running away from the halfway house to meet with the Randall brothers, despite needing a means of supporting himself from

the moment he escaped. *Id.* at 122. She also noted that Henderson had provided divergent accounts during his testimony of how he connected with Randall, first saying he had connected through Facebook because he did not have a phone, then later claiming to have called him. *Id.* at 122-23. She also observed that Henderson's description of the interaction he had with Randall during the meeting used the same unusual word – "playful" – Randall had used in his testimony, suggesting collusion. *Id.* at 123. She also found the claim that Randall gave Henderson 125 grams of crack, which was worth "at least $10,000," "with no promise of repayment" to be "absurd." *Id.* at 124-25.

Accordingly, the trial court rejected Randall's claim that he had newly discovered evidence meriting a new trial. The court observed that a defendant claiming an alibi witness is aware of the witness from the outset, and because Randall and Henderson were well acquainted at the time of the shooting, Randall failed to establish that he could not have obtained Henderson's testimony with reasonable diligence at trial. The court also determined that Randall could not show prejudice because Henderson's testimony lacked credibility.

Randall filed a timely appeal and asks us to review the following issues:

> 1. Whether the trial court erred in finding [Randall] guilty of Attempted Murder because the evidence was insufficient to support the verdict.
>
> 2. Whether the trial court erred in denying the After-Discovered Evidence Motion because [Randall's] alibi witness was credible, unavailable at the time of trial, and if

a new trial were granted, the verdict would likely be different if he testified.

Randall's Br. at vii.

In his first issue, Randall argues that the evidence presented at trial was insufficient to support his conviction for attempted murder. Specifically, he claims that the Commonwealth failed to set forth any evidence that he had the specific intent to kill the Complainant. Randall avers that the evidence did not show that he aimed at a vital body part of the Complainant. Instead, Randall baldly asserts that the evidence "suggests" that Randall's actions were "a defensive response" to Complainant and his associates' aggression. Randall's Br. at 2. We disagree.

When reviewing a challenge to the sufficiency of the evidence, we ask "whether[,] viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt." ***Commonwealth v. Brown***, 23 A.3d 544, 559 (Pa.Super. 2011) (*en banc*) (citation omitted). Our standard of review is *de novo* and our scope of review is plenary. ***See Commonwealth v. Neysmith***, 192 A.3d 184, 189 (Pa.Super. 2018).

Germane to this appeal are the elements required to support a conviction for attempted murder:

> [u]nder the Crimes Code, "[a] person commits an attempt when with intent to commit a specific crime, he does any act which constitutes a substantial step towards the commission of the crime." 18 [Pa.C.S.A.] § 901(a). A person may be convicted of attempted murder if he takes a substantial step toward the

commission of a killing, with the specific intent in mind to commit such an act. *See* 18 [Pa.C.S.A.] §§ 901, 2502. The substantial step test broadens the scope of attempt liability by concentrating on the acts the defendant has done and does not any longer focus on the acts remaining to be done before the actual commission of the crime. The *mens rea* required for first-degree murder, specific intent to kill, may be established solely from circumstantial evidence. [T]he law permits the fact finder to infer that one intends the natural and probable consequences of his acts.

*Commonwealth v. Jackson*, 955 A.2d 441, 444 (Pa.Super. 2008) (most internal citations and quotation marks omitted).

Specific intent may be inferred through the use of deadly force on a vital part of the victim's body. *Commonwealth v. Johnson*, 107 A.3d 52, 66 (Pa. 2014). "Further, specific intent may be formed in an instant." *Commonwealth v. Mollett*, 5 A.3d 291, 313 (Pa.Super. 2010).

In the instant case, as detailed above, three eyewitnesses, Michael Brunetti, Christina Brunetti and Jessica Serrano, all of whom knew Randall, testified that they saw Randall shoot the Complainant in the head.[3] A shot to the head certainly constitutes a use of deadly force on a vital part of a victim's body, thus establishing Randall's specific intent to kill Complainant, even if such intent was formed in the instant before the shot. *See Jackson*, 955 A.2d at 444; *Johnson*, 107 A.3d at 66; *Mollett*, 5 A.3d at 313. Thus, viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, we conclude that the trial court properly determined that ample evidence established Randall had the requisite specific intent to commit

---

[3] Two other witnesses, Jahlil Blount and Diana Sheard, identified Randall, together with his brother, co-defendant, as one of two shooters.

murder. **See Brown**, 23 A.3d at 559. Therefore, Randall's first issue does not warrant relief.

Turning to his second issue, Randall argues that the trial court abused its discretion by failing to grant him a new trial in light of the "after-discovered" testimony of Henderson. To this end, Randall contends that the trial court erred in determining that Henderson's testimony could have been acquired prior to the conclusion of the trial. While, Randall specifically acknowledges that he would have known about an alibi witness at the time of trial, he cites the logistical difficulties he allegedly would have experienced in procuring that testimony because Henderson contends that he was a fugitive from 2011 until 2015, living at various times in Florida, South Carolina, Georgia, and Pennsylvania. Further, Randall asserts that the trial court erred by not concluding that Henderson's testimony at trial would have likely commanded a "not guilty" verdict. He emphasizes that the evidence linking him to the crime are "inconsistent eyewitness statements." Randall's Br. at 23-24. Once again, we disagree.

We begin by noting that when reviewing a trial court's decision to grant or decline to grant a new trial on the basis of after-discovered evidence, "we ask only if the court committed an abuse of discretion or an error of law which controlled the outcome of the case." **Commonwealth v. Padillas**, 997 A.2d 356, 361 (Pa.Super. 2010) (citation omitted). "Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where

- 11 -

the record shows that the action is a result of partiality, prejudice, bias or ill will." *Id.* (citation omitted). It is beyond cavil that it is the province of the fact-finder to believe all, part, or none of the evidence. ***Commonwealth v. Rabold***, 920 A.2d 857, 859 (Pa.Super. 2007).

To be granted a new trial, a defendant must prove that the after-discovered evidence:

> (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted.

***Padillas***, 997 A.2d at 363 (citation omitted). "The test is conjunctive; the defendant must show by a preponderance of the evidence that each of these factors has been met in order for a new trial to be warranted." *Id.*

The trial court concluded that Henderson's testimony was not sufficient to warrant a new trial because it could have been discovered prior to trial and even if admitted at trial it would likely not have compelled a different result. ***See id.*** We agree. As noted by the court, Randall would have known of the existence of any alibi witness at the time of the crime, and the court disbelieved all of Randall's testimony, including that he did not know Henderson's last name at the time of the crime or how to contact him. These findings are supported by the record, and they therefore bind us. *Id.* at 365; ***Rabold***, 920 A.2d at 859.

Moreover, Randall's argument that Henderson's testimony would have compelled a different result at trial is also meritless in light of the trial court's determination that Henderson's testimony was not credible. In view of that finding, the internal inconsistencies in Henderson's testimony, and the eyewitness testimony at trial identifying Randall as the shooter, Randall has not shown that the trial court erred in denying him relief. *Id.* Therefore, Randall's second issue on appeal also must fail and we affirm Randall's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/21/19