J-S19025-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MASON DAVON QUAILES | : | |
| | : | |
| Appellant | : | No. 1640 MDA 2022 |

Appeal from the Judgment of Sentence Entered October 20, 2022
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0000991-2021

BEFORE:  BENDER, P.J.E., McLAUGHLIN, J., and SULLIVAN, J.

MEMORANDUM BY McLAUGHLIN, J.:　　　**FILED: NOVEMBER 7, 2023**

Mason Davon Quailes appeals the judgment of sentence entered following his convictions for second-degree murder, burglary, and conspiracy.[1] Quailes challenges the admission of evidence and both the sufficiency and weight of the evidence. We vacate the judgment of sentence imposed for the burglary conviction, but affirm in all other respects.

The Commonwealth presented the following evidence at trial. A retired U.S. Fish and Wildlife Special Agent, William Anderson, testified that on the day in question, while driving home, he heard three gunshots. N.T., Trial, 10/17/22, at 127-28. He then saw a thin African American male running down the stairs outside of a home, later determined to be the victim's home. *Id.* 129, 131. The male was wearing all black. *Id.* at 132. As Anderson drove past

---

[1] 18 Pa.C.S.A. §§ 2502(b), 3502(a)(1)(i), and 903, respectively.

the home, he saw another African American male lying on the ground and an African American male standing over the male on the floor. *Id.* at 129-30. The male who was standing was aiming a gun at the male on the ground and yelling at him. *Id.* at 130. As Anderson continued driving past the home, he heard two loud bangs. *Id.* at 131. After hearing this noise, Anderson called 911. *Id.* at 128.

Chief Anthony Minium testified that on the day in question, he responded to a home in Steelton, Pennsylvania, after receiving a call for shots fired. *Id.* at 105-06. He arrived at approximately 1 p.m. *Id.* at 106. There, he found the victim unresponsive and lying in front of the doorway, with no pulse. *Id.* at 107. Chief Minium testified that before he received the call, there was a call for a domestic disturbance involving the victim and Shnasia Peterson, at a home four blocks away. *Id.* at 108, 111, 118; N.T., Trial, 10/18/22, at 283.

Officer Brett DeGroat testified that he arrived on the scene after receiving a call for shots fired. N.T., Trial, 10/17/22, at 95. He saw the victim lying on the floor with blood on his shirt. *Id.* at 97. Officer DeGroat removed the shirt to see if the victim had bullet wounds and saw a bullet wound in the victim's lower back. *Id.*

Wayne Rosse, a forensic pathologist, testified that the victim died from multiple gunshot wounds and ruled his manner of death as a homicide. N.T., Trial, 10/18/22, at 204. The victim sustained five gunshot wounds, the fatal one entering his left upper back. *Id.* at 215-16.

Robert Gerrity, Jr. testified that he installs electronic monitoring devices for the Commonwealth of Pennsylvania. *Id.* at 261. These devices record the movements of an individual throughout the day. *Id.* He testified that he installed a monitoring device on Quailes on June 10, 2020. *Id.* at 263. He testified that he reviewed Quailes' movements from the day of the murder. *Id.* at 264. The information from the monitoring device recorded that Quailes was in the area of 523 North Front Street in Steelton, PA at approximately 12:42 p.m. *Id.* at 271. Quailes stayed in the area between 531 and 532 North Front Street between 12:43 p.m. to 12:49 p.m. Gerrity also testified that the following day, Quailes' monitor was cut off and no longer working. *Id.* at 273.

Shnasia Peterson testified that she was in a relationship with the victim. *Id.* at 289. On the day of the murder, while at the victim's home, the two began arguing. *Id.* at 288-89. Peterson testified that the victim began hitting her and at one point kicked her in the face. *Id.* at 288-89, 291. She left the victim's home and returned to her own where she called her friend Aubriana Parisi. Peterson told Parisi what happened and the two talked about having someone rob and fight the victim. *Id.* at 292. Parisi suggested that her boyfriend, Quailes, could do it because that is what he "got into." *Id.* Peterson and Parisi "set everything up" and after speaking with Parisi, Peterson called 911 to report the domestic incident. *Id.* at 294. She testified that she called the police because she wanted the victim to get in trouble for hitting her. *Id.*

The same day, Parisi called Peterson and told her that the "boys" were on the way. *Id.* at 296. When Peterson went outside, Quailes and another

man, Marcus Garner, were outside. *Id.* Peterson told the men what happened with the victim, gave them his address, and told them that the victim had multiple bank cards. *Id.* Before the two men left, Peterson told the men not to kill the victim. *Id.* After the men left her home, the police contacted Peterson. She informed them of the fight between her and the victim. *Id.* at 297. Quailes returned to Peterson's house and said, "[S]hit went left." *Id.* at 298. Peterson testified that she then heard police sirens. *Id.* at 299. Following this, Garner ran up the street and it appeared to Peterson that he had a gun in his pants. *Id.* She testified that as he ran, Garner gripped his shorts tightly as if he was holding something. *Id.*

Peterson also testified regarding her phone's call log on the day of the murder. She agreed that she received a FaceTime call from "Aubri" at 12:10 p.m., a call from Quailes around the same time, another call from "Aubri" at 12:13 p.m., two FaceTime calls with Aubriana at 12:35 p.m., and a 911 call at 12:25 p.m. *Id.* 301-03.[2] She also had a FaceTime call with Aubriana and Quailes at 12:30 p.m. *Id.* at 303.

Peterson further testified that she accepted a plea agreement relating to her involvement in the case. *Id.* at 284. She pled guilty to robbery, burglary, and two counts of conspiracy. *Id.* at 285.

Aubriana Parisi testified that she received a call from her friend Peterson on the day of the murder. N.T., Trial, 10/19/22, at 353. Peterson told her that

---

[2] Peterson identified "Aubri," as her friend Aubriana Parisi. **See** N.T., Trial, 10/18/22, at 302.

"she had a domestic dispute with her boyfriend" but Parisi testified that she did not know his name. *Id.* at 354-55. Parisi told Peterson to call the police. *Id.* at 355. She testified that at some point she had a three-way Facetime call with Peterson and Quailes but did not recall what they talked about. *Id.* at 356. The Commonwealth confronted Parisi with her police statement and after reviewing the statement Parisi testified that while on the phone with Peterson and Quailes, they discussed that the victim had a lot of bank cards and that Peterson wanted someone to rob him. *Id.* at 357-59. Parisi saw Quailes on the day of the murder, and he was wearing all black. *Id.* 361-62 She also told detectives that Quailes told her the gun was in the river. *Id.* at 364.

Parisi testified that while Quailes was in jail, he sent her a letter which she handed over to the police. *Id.* at 365. When the Commonwealth attempted to present the letter to the witness, counsel asked to approach for a sidebar where the following exchange occurred:

> [Defense Counsel]: I believe the Commonwealth's attempting to introduce this letter and I would object to admitting this letter because I don't believe it's relevant. There's only one mention of this actual sort of case where they -- where he mentions the name Shnasia. Other than that, the whole letter is about infidelity and then it's about – he's upset that he believes she is seeing another man and I don't think that's relevant. I think under 403(b) it's more prejudicial than it is probative and I don't think it's relevant.
>
> [Commonwealth]: Your Honor, I think the fair reading of the letter is that he is threatening her as a potential witness against him and I think it's highly relevant for consciousness of guilt.
>
> [Defense Counsel]: See, I don't think the letter shows him threatening her as a witness. It's threatening her – it's a

threat about sleeping with another man, not about a witness in this case.

[Commonwealth]: He can certainly argue that.

THE COURT: All right. Give me a minute to look at it. Stay here.

All right. So it appears there are different aspects here. Certainly there is a significant portion of it dealing with threats towards the witness because she's the one who got him under investigation with Shnasia. I don't know the first part, Mr. Sprow, that talks about, I'm going to kill him when he come home, you did this. I don't know if that first few sentences --

[Commonwealth]: I'm not sure but I think in its entirety it's fairly clear that this is a message to her communicating threats because of her role as a witness against him in this case.

THE COURT: Mr. Deyo, you are objecting to its entirety?

[Defense Counsel]: In the first paragraph it says: "Shaking my head, I thought you was my wife." I mean, this is a letter -- the tone of the letter is more about the infidelity aspect than it is her testifying as a witness, just as a witness.

THE COURT: We'll allow it, but if it goes out to the jury is another matter.

*Id.* at 365-67. Parisi testified that she handed the letter over to the police because she did not want to be involved any further with the case and "because when you tell on somebody, bad stuff happens." *Id.* at 377, 378.

In the letter, Quailes wrote, "You better hope I don't kill you cause you the one who got me under investigation for the shit with Shnasia and you trying to do me dirty." *Id.* at 370. He also wrote, "I know where you sleep. I will wait till you leave the crib if I have to and if you tell the cops about this I'm [sic] tell my folks to get to you." *Id.* He further wrote, "I don't care about

my life I want yours, Shnasia and a couple others. Watch I'ma [sic] end up doing something to you that's how I'm feeling. Hope that money was worth ya life." ***Id.*** at 370-71.

Quailes testified that he was present at the victim's home the day of the murder along with his friend, Keyshawn Carter. ***Id.*** at 391-92. He testified that when he tried speaking with the victim, the victim started "swinging" at him and the two began fighting. ***Id.*** at 393. Quailes heard gunshots but did not know where they were coming from. ***Id.*** Quailes then saw the victim fall to the ground. ***Id.*** Quailes also testified that he wrote a letter to Parisi because he believed she was dating another man. ***Id.*** at 394. He testified that on the day of the murder, he was wearing all black and identified himself as the male seen in a surveillance footage showing the rear of the victim's home on the day of the murder. ***Id.*** at 395.[3]

On rebuttal, William Shaub, an interim police chief, testified that during a proffer with Quailes, Quailes identified Marcus Garner as the other individual who was with him the day of the murder. ***Id.*** at 399, 400.

The jury found Quailes guilty of the above referenced offenses and the trial court sentenced him to mandatory life imprisonment for second-degree murder. It imposed no further penalty for conspiracy and a concurrent term of five to 10 years' incarceration for the burglary conviction. Quailes filed a

---

[3] The parties stipulated to the admission of three separate surveillance videos "captur[ing] events . . . contain[ing] the rear portions of the odd numbered residences in the 500 block of North Front Street, including 517 North Front Street." N.T, Trial, 10/18/22, at 280-82.

post-sentence motion challenging the sufficiency and weight of the evidence. The court denied the motion and this timely appeal followed.

Quailes raises the following issues:

A. Whether the trial court erred in accepting the jury's verdict where the Commonwealth failed to present sufficient evidence [Quailes] was a participant or accomplice to the burglary.

B. Whether the trial court erred in accepting the jury's verdict which went against the weight of the evidence which established [Quailes] did not engage in a burglary.

C. Whether the trial court erred in permitting the introduction of a letter to Ms. Parisi allegedly from [Quailes] in that the prejudicial effect outweighed any possible probative value.

Quailes' Br. at 4 (suggested answers omitted).

Quailes argues that the Commonwealth presented insufficient evidence to support his convictions for second-degree murder and burglary because the evidence was insufficient to prove burglary. He maintains that there was no evidence that he entered the victim's residence with the intent to commit a crime. He also argues that there was no evidence that he shot the victim or that he had a gun. He notes that while it was alleged that he went to the residence to rob the victim of his bank cards, "[o]fficers did not find 'cards' on [Quailes], in his residence, in his vehicle or anywhere else." *Id.* at 12.

When reviewing a sufficiency claim, we must determine whether, when viewed in a light most favorable to the verdict winner, the evidence at trial and all reasonable inferences therefrom were sufficient for the trier of fact to find that each element of the crime charged is established beyond a

reasonable doubt. *See Commonwealth v. Neysmith*, 192 A.3d 184, 189 (Pa.Super. 2018). "The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." *Commonwealth v. Brown*, 23 A.3d 544, 559 (Pa.Super. 2011) (*en banc*) (quoting *Commonwealth v. Hutchinson*, 947 A.2d 800, 806 (Pa.Super. 2008)). The trier of fact is also free to believe all, some, or none of a witness's testimony. *Commonwealth v. Morales*, 91 A.3d 80, 89 (Pa. 2014).

Second-degree murder is a criminal homicide committed while the defendant was engaged as a principal or an accomplice in the perpetration of an enumerated felony, including burglary. 18 Pa.C.S.A. § 2502(b), (d). A person is guilty of burglary if he "enters a building or occupied structure, or separately secured or occupied portion thereof, that is adapted for overnight accommodations in which at the time of the offense any person is present" and he "commits, attempts or threatens to commit a bodily injury crime therein[.]" *Id.* at § 3502(a)(1)(i). "[M]ere presence on the scene both immediately prior to and subsequent to the commission of a crime and flight therefrom is not," without more, "sufficient evidence to prove involvement in the crime." *Commonwealth v. Hargrave*, 745 A.2d 20, 23-24 (Pa.Super. 2000) (cleaned up).

Quailes' claim is meritless. There was ample evidence to prove burglary. The evidence showed that Peterson and Parisi conspired to have Quailes and Garner fight and rob the victim. Peterson gave the men the victim's address

and told them that he had bank cards on him. The men subsequently went to the victim's house and while they were there, the victim was shot. Even considering Quailes' suggestion that there is no evidence that he shot the victim or that he had a gun, the evidence sufficiently established that Quailes entered the victim's home with the intent to commit a bodily injury crime, namely, to assault and rob the victim. Additionally, Quailes admitted to being present at the victim's home. Although he maintains that he was only there to speak with the victim, it was within the jury's purview to believe all, part, or none of his testimony.

Next Quailes maintains that the verdict was against the weight of the evidence because he did not participate in the burglary. He argues that he was not "an active part" of the burglary or shooting and that his mere presence at the victim's home does not amount to him being an active participant in the burglary. Quailes' Br. at 14.

We review the trial court's ruling on a challenge to the weight of the evidence for an abuse of discretion. **Commonwealth v. Clay**, 64 A.3d 1049, 1054–55 (Pa. 2013). "Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence." **Id.** at 1055 (quoting **Commonwealth v. Widmer**, 744 A.2d 745, 753 (Pa. 2000)). A trial court should not grant a new trial unless the verdict "is so contrary to the evidence as to shock one's sense of justice and

the award of a new trial is imperative so that right may be given another opportunity to prevail." *Id.* (quoting *Commonwealth v. Brown*, 648 A.2d 1177, 1189 (Pa. 1994)).

Quailes does not contest that he was at the victim's home but rather argues that he was merely present. Quailes' argument that he was merely present at the victim's home focuses solely on his testimony. However, the evidence presented to the jury included evidence that Quailes went to the victim's home with an instruction from Peterson to fight and rob the victim. Again, the jury was free to believe all, part, or none of the testimony and evidence presented. We see no abuse of discretion.

In his final issue, Quailes argues that the court erred in admitting the letter he wrote to Parisi. He maintains that the letter was irrelevant and greatly prejudiced him before the jury. In his view, it had little probative value because the Commonwealth did not charge him with intimidation of a witness. He also argues that any probative value was outweighed by the letter's prejudicial effect.

We review the admission of evidence for an abuse of discretion. *See Commonwealth v. Elliott*, 80 A.3d 415, 446 (Pa. 2013). Evidence is admissible if it is relevant. Pa.R.E. 402. However, even relevant evidence may be excluded if its probative value is outweighed by the "danger" of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. Unfair prejudice "means a tendency to suggest decision on an improper basis or to

divert the jury's attention away from its duty of weighing the evidence impartially." *Id.* at comment.

Here, the court determined the probative value of the letter outweighed any prejudicial effect. It explained:

> Here, the contents of the letter from [Quailes] to Ms. Parisi were more probative than prejudicial because it contained what she perceived as threats based on her cooperation with the police investigation surrounding the September 2, 2020 incident and [Quailes'] involvement. The letter also helped explain Ms. Parisi's reluctance to testify.

Trial Court Opinion [Pursuant to Pa.R.A.P. 1925(a)], filed 3/6/23, at 16.

The court did not abuse its discretion. The letter was strong evidence of Quailes' consciousness of guilt. "[A]ny attempt by a defendant to interfere with a witness's testimony is admissible to show a defendant's consciousness of guilt." *Commonwealth v. Johnson*, 838 A.2d 663, 680 (Pa. 2003). The letter here also explained Parisi's reluctance to testify. Though Quailes maintains that the letter was more prejudicial than probative, he does not explain how it tended "to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Pa.R.E. 403, comment. We cannot say that the trial court committed an abuse of discretion in admitting it.

Though Quailes did not raise it, we must address whether Quailes' murder and burglary convictions merge, as the issue goes to the legality of the sentence. *See Commonwealth v. Hill*, 238 A.3d 399, 407-08 (Pa. 2020) (stating appellate court may raise and address challenge to legality of

sentence *sua sponte*); ***Commonwealth v. Leaner***, 202 A.3d 749, 784 (Pa.Super. 2019) (stating claim that crimes should have merged is a challenge to the legality of sentence).

Here, the trial court erred in sentencing Quailes for both burglary and second-degree murder. ***See Learner***, 202 A.3d at 784 ("a sentencing court has no authority to impose a sentence for felony murder as well as a sentence for the predicate offense"). As such, we vacate the sentence for burglary. However, because the remaining sentence of life imprisonment does not upset the overall sentencing scheme, remand for resentencing is not necessary. ***See Commonwealth v. Thur***, 906 A.2d 552, 569 (Pa.Super. 2006) (stating if this Court's grant of relief on a sentencing issue "does not alter the overall [sentencing] scheme, there is no need for a remand").

Judgment of sentence vacated as to burglary. Judgment of sentence affirmed in all other aspects.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>11/7/2023</u>